UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMPSON STRONG-TIE COMPANY, INC., a California corporation,<br><br>　　　　Plaintiff(s),<br><br>　v.<br><br>TODD ESREY, an individual dba ESREY.COM,<br><br>　　　　Defendant(s). | No. C04-4608 CW (BZ)<br><br>**REPORT AND RECOMMENDATION RE: PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |

　　　Pursuant to Judge Wilken's order dated January 18, 2005, this matter was referred to me to prepare findings and a recommendation on plaintiff's Motion for Default Judgment.

　　　On October 29, 2004, plaintiff filed a complaint for trademark infringement, trademark dilution, unfair competition, and cybersquatting against defendant based on defendant's alleged unauthorized registration and use of domain names that incorporate terms and names that are identical or confusingly similar to plaintiff's registered trademarks. On November 11, 2004, plaintiff served defendant with the Summons and a copy of the Complaint. Defendant did

1

1  not answer or file any responsive pleadings.  On January 1,
2  2005, upon plaintiff's request, the Clerk of this court
3  entered the default of defendant under Federal Rule of Civil
4  Procedure 55(a). Plaintiff then moved for a default judgment,
5  requesting of a permanent injunction, statutory damages,
6  attorneys' fees, and costs.
7  　　　A hearing was held on April 6, 2005.  Defendant appeared.
8  I reviewed the procedural history of this action with
9  defendant, and suggested that he retain counsel to represent
10 him in this matter.  I also notified him that he could move to
11 set aside his default, settle the case, or return to court and
12 contest the amount of damages.  I continued the hearing to
13 June 29, 2005.  Defendant did not move to set aside the
14 default; nor did he reach any agreement with plaintiff or
15 retain counsel.  He appeared at the June 29, 2005 hearing.
16 After taking some testimony the matter was continued to July
17 11, 2005.  The July 11, 2005 hearing lasted 90 minutes before
18 a recess for lunch.  Upon resuming the hearing, defendant
19 stated that he felt ill, and I continued the hearing to the
20 next morning.  The hearing concluded on July 12, 2005 after
21 two hours.
22 　　　The decision to grant or deny a default judgment under
23 Rule 55(b) is within the discretion of the court.  See Fed. R.
24 Civ. P. 55(b); Eitel v. McCool, 782 F.2d 1470, 1471 (9th Cir.
25 1986); Shanghai Automation Instrument Co. v. Kuei, 194 F.
26 Supp. 2d 995, 999 (N.D. Cal. 2001).  By his default, defendant
27 is deemed to have admitted the well-pleaded averments of the
28 complaint except as to the amount of damages, including

statutory damages, attorneys' fees, and costs.  See Fed. R. Civ. P. 8(d); Geddes v. United Financial Group, 559 F.2d 557 (9th Cir. 1977).  Having reviewed plaintiff's complaint, I find that the allegations are sufficiently well-pled to establish defendant's liability under a number of theories including the Anticybersquatting Consumer Protection Act.  The remaining issue for default judgment is the relief available to plaintiff.  Plaintiff seeks statutory damages under the Anticybersquatting Consumer Protection Act ("ACPA").  15 U.S.C. § 1125(d)(1).  Pursuant to 15 U.S.C. § 1117, an aggrieved plaintiff is permitted to recover statutory damages for a violation of § 1125(d)(1) "in an amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just."  15 U.S.C. § 1117(d).  Plaintiff seeks statutory damages of up to $100,000 per domain name for defendant's use and registration of four domain names, which plaintiff claims are identical or confusingly similar to its trademarks, *simpsonstrongtie.com*, *simpsonstrong-tie.com*, *strong-tie.com*, and *strong-wall.com*.

Plaintiff Simpson Strong-tie Company, Inc., in business since 1956, sells construction products and specializes in metal devices designed to connect construction components. Compl. ¶ 7.  Simpson owns a family of registered and common-law trademarks which include the Simpson name. Compl. ¶ 9. Simpson's registered trademarks include, "STRONG-TIE," "SIMPSON STRONG-TIE," SIMPSON STRONG-TIE CONNECTORS," "STRONG-WALL," and "SIMPSON STRONG-WALL."  See Compl. ¶¶ 10-18; Pl.'s Mot. for Default J., Ex. A-G.  Defendant does not deny that he

3

1  registered these four domain names.

2  Plaintiff and defendant both acknowledge that defendant
3  spoke with Bob O'Connor, a vice president at Simpson sometime
4  prior to October, 2003 regarding the domain names.  TT[1] of
5  6/29/05 at 20; 21-25.  Although there is disagreement as to
6  whether the conversations with O'Connor took place in 2002 or
7  2003, it is undisputed plaintiff asked defendant to transfer
8  all domain names relating to Simpson's name and registered
9  trademarks to plaintiff.  Plaintiff and defendant disagree as
10 to whether defendant transferred those domain names to Simpson
11 prior to October 2003.[2]

12 Plaintiff provided evidence and testimony that in October
13 2003, four domain names relating to Simpson were registered in
14 defendant's name; *simpsonstrongtie.com*, *simpsonstrong-tie.com*,
15 *strong-tie.com*, and *strong-wall.com*.  Compl. ¶ 22.  That same
16 month plaintiff sent two cease and desist letters to
17 defendant, the first on October 6, 2005, and the second on
18 October 17, 2005.  Munzinger Decl. ¶ 4.  Defendant denies
19 receiving the October 6, 2005 letter.  TT of 6/29/05 at 27;
20 16-19.

21 After receiving no response to either letter, plaintiff's
22 counsel called defendant.  Munzinger Decl. ¶ 5.  During their
23 conversation, defendant told plaintiff's counsel that 1) he
24 knew of plaintiff, its business, and its marks because he and

---

[1]  Trial Transcript

[2]  While testimony by Bob O'Connor might have helped to elucidate the facts, neither side called O'Connor as a witness. The only witness from Simpson either side chose to call was Simpson's CFO who had little personal knowledge of the events.

4

his employer had done business with plaintiff; 2) he knew the infringing domain names were of value to plaintiff and knew that plaintiff would seek to obtain them from him; and 3) he believed he was doing plaintiff a favor by "holding" the domain names for plaintiff.  Compl. ¶ 25; Munzinger Decl. ¶ 5. In December of 2003, after several telephone conversations with plaintiff's counsel defendant agreed to permanently transfer ownership of the domain names to plaintiff and informed plaintiff that he had done so.  Compl. ¶ 26; Munzinger Decl. ¶ 7.  Plaintiff's counsel confirmed that defendant completed the transfer, and plaintiff began placing the *strong-tie.com* domain name on its products.  Compl. ¶¶ 26-27; Munzinger Decl. ¶ 7.

There is no evidence that defendant took any action to re-register the domain names or any additional domain names using Simpson's name or registered trademarks.  However on May 26, 2004, at least one of the four domain names, *strong-tie.com*, expired.  Pl.'s Ex. 3 at 3.  This domain name was apparently re-registered in defendant's name on August 20, 2004.  Pl.'s Ex. 4 at 2.  Defendant denies taking affirmative steps to re-register *strong-tie.com*.  Rather, defendant claims that the registrar may have automatically renewed *strong-tie.com* in defendant's name.[3]  TT of 7/12/05 at 17.

Even though defendant "transferred" the four domain names

---

[3]  Neither plaintiff nor defendant presented any evidence from the registrar, Enom, as to whether anyone took affirmative steps to re-register *strong-tie.com* after the registration expired, or alternatively, whether that domain name was automatically renewed.

5

to plaintiff by changing the administrative, billing, technical and registrant data to plaintiff's contact information, defendant testified that he placed the domain names in a sub-account of his primary account with the registrar, Enom.  TT of 7/12/05 at 27.  All of defendant's accounts were in a "locked" status, and plaintiff was unable by itself to transfer the domain names to a new registrar. Plaintiff did not seek defendant's assistance but filed this action.  TT of 7/12/05 at 12.

In February 2005, after having been served with plaintiff's Motion for Default Judgment, defendant transferred all four domain names to an entirely separate account in plaintiff's name.  Supplemental Declaration of Richard F. Munzinger in Support of Plaintiff's Motion for Default Judgment ("Munzinger Supp. Decl.") ¶¶ 5-7.  All four domain names are now registered in plaintiff's name and are under plaintiff's control.  Munzinger Supp. Decl. ¶ 8.

15 U.S.C. § 1117(d) prescribes damages for a violation of the ACPA, and allows a court to award statutory damages in an amount from $1,000 to "$100,000 per domain name, as the court considers just."  15 U.S.C. § 1117(d).  "A review of the cases reveals that courts reserve the high-end of the $1,000 to $100,000 range for the most egregious offenders." Int'l Bancorp v. Societe des Bains de Mer, 192 F.Supp.2d 467, 490 (E.D. Va. 2002); Electronics Boutique Holdings Corp. v. Zuccarini, No. CIV.A.00-4055, 2000 WL 1622760, at *8 (E.D. Pa. Oct. 30, 2000).  However, where "[t]he need for deterrence is not exceptional" and where little harm is done

6

1  to the plaintiff, a minimal award of statutory damages is
2  appropriate.  <u>Mattel, Inc. v. Adventure Apparel</u>, No.
3  00CIV.4085(RWS), 2001 WL 1035140, at *5 (S.D.N.Y. Sept. 7,
4  2001).  I recommend that plaintiff be awarded minimal
5  statutory damages.  Plaintiff offered no proof of any
6  economic harm to its business as a result of defendant's
7  actions.  Defendant never asked for money in exchange for any
8  of the domain names he registered containing Simpson's name
9  or registered trademarks.  TT of 6/29/05 at 15; 15-16.  In
10 fact, defendant that testified at one point he refused
11 plaintiff's offer of money for his expenses.  <u>Id</u>. at 15; 17-
12 18.  I do not believe that the need for deterrence in this
13 case is exceptional.  Therefore, I find that statutory
14 damages of $4,000 for the domain name *strong-tie.com* and
15 $2,000 for the remaining three domain names, for a total of
16 $10,000, is a just amount.
17       Plaintiff also seeks $36,631.00 in attorneys' fees.  <u>See</u>
18 Munzinger Supp. Decl., Ex. AA, CC.  The party requesting fees
19 must make an adequate showing of the time expended and the
20 rates claimed.  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433
21 (1983).  "The burden of establishing an entitlement to an
22 attorneys' fee award lies solely with the claimant."  <u>Id</u>. at
23 437.  Counsel must submit "detailed time records justifying
24 the hours claimed to have been expended."  <u>Chalmers v. City</u>
25 <u>of Los Angeles</u>, 796 F.2d 1205, 1210 (9th Cir. 1986).  "Where
26 the documentation is inadequate, the district court is free
27 to reduce an applicant's fee award accordingly."  <u>Hensley</u>,
28 461 U.S. at 433.  The billing statements provided to the

7

1  Court by plaintiff are redacted.  While the billing
2  statements generally demonstrate that these fees were
3  reasonably incurred, many of the entries fail to identify the
4  subject matter of the work performed.  As a result, I am
5  unable to determine whether the fees associated with these
6  entries are reasonable.  I therefore recommend that the Court
7  reduce any award of attorneys' fees by 20 percent.
8      Attorneys' fees are reasonable in "exceptional cases,"
9  in which a defendant has acted in bad faith or where the acts
10 of infringement were malicious, deliberate, or willful.  See
11 15 U.S.C. § 1117(a); Playboy Enters., Inc. v. Baccarat
12 Clothing Co., 692 F.2d 1272, 1276 (9th Cir. 1982); Discovery
13 Communications, Inc. v. Animal Planet, Inc., 172 F. Supp. 2d
14 1282, 1291 (C.D. Cal. 2001).  "The word [willfully] often
15 denotes an act which is intentional, or knowing, or
16 voluntary, as distinguished from accidental."  U.S. v.
17 Murdock, 290 U.S. 389, 394 (1933).  Attorneys' fees may also
18 be appropriate where a defendant engages in "dilatory
19 litigation tactics".  See Mattel, Inc., 2001 WL 1035140, at
20 *5.
21     Here, defendant acted willfully.  It was no accident
22 that defendant registered the four domain names in question.
23 Defendant was aware that plaintiff used the words "Simpson",
24 "Strong-tie", and "Strong-wall" in conducting its business,
25 and intentionally registered domain names containing
26 plaintiff's trademarks.  I also find that defendant was
27 dilatory in his dealings with plaintiff's counsel in 2003
28 when they contacted him about transferring the domain names

8

into plaintiff's name and unreasonable in his position that he did not want to deal with counsel and wanted instead to deal with Simpson.  Had defendant not retained control over the four domain names by placing them in a sub-account of his primary account, resulting in the either automatic or intentional re-registration of the *strong-tie.com* domain name after plaintiff began using it on its products, a significant portion of the fees would not have been incurred.  Defendant should have created an entirely separate account from his own and placed Simpson's domain names in the new account, as he ultimately did.

However, plaintiff provided no evidence that defendant purposely took back the domain name *strong-tie.com*.  After learning *strong-tie.com* was re-registered in defendant's name, plaintiff did not contact defendant to try to regain control of the re-registered domain name.  Had it tried to resolve this matter directly with defendant, much of these attorneys' fees might not have been incurred.

In light of the foregoing, I recommend recovery of some, but not all, of plaintiff's attorneys' fees from plaintiff. I recommend that plaintiff recover all requested fees, through October of 2003 when the record shows defendant transferred the four domain names in question to plaintiff. I recommend that these fees be reduced by 20 percent for inadequate billing statements.  The frequent unexplained redactions make the inadequate records especially hard to understand.  This amount is $4,013.90, less $802.78 for inadequate billing statements, for a total of $3,211.12.

9

Further, I recommend that plaintiffs recover 50 percent of the fees requested after this time, less 20 percent for inadequate billing statements, because of their failure to attempt to resolve this problem which they helped create by not re-registering *strong-tie.com* without resorting to litigation.  This amount is $16,308.55, less $3,261.71 for inadequate billing statements, for a total of $13,046.84.  Therefore I recommend plaintiff recover $16,257.96 in attorneys' fees.

In addition to attorneys' fees, plaintiff seeks to recover $3,520.44 in costs.  See Munzinger Supp. Decl., Ex. AA, CC.  15 U.S.C. § 1117(a) provides for the award of costs for a violation of the ACPA.  See 15 U.S.C. § 1117(a).  I recommend that plaintiff be awarded $3,485.71 in costs.[4]

Plaintiff also seeks an injunction to prevent further acts of infringement, dilution and cybersquatting. Injunctive relief is the "remedy of choice" for trademark infringement cases.  See 15 U.S.C. § 1116(a); see also Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir. 1988).  In trademark cases, where there is a likelihood of confusion between the plaintiff's and defendant's trademarks, irreparable harm is ordinarily presumed for purposes of awarding injunctive relief.  See Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612, n.3 (9th Cir. 1989).  Injunctive relief is also appropriate in

---

[4] I have decreased plaintiff's requested amount by $34.73 because plaintiff requests a total of $159.62 for photocopying but the documents support only $124.89.

10

1  cases involving default.  See, e.g., Discovery
2  Communications, Inc., 172 F. Supp. 2d 1282; PepsiCo, Inc.,
3  189 F.R.D. 431.  Though the infringing domain names are now
4  within plaintiff's control, in light of defendant's past
5  behavior and the fact that he has registered thousands of
6  domain names, I find that injunctive relief requiring the
7  destruction of infringing materials and prohibiting defendant
8  from using plaintiff's trademarks or any derivation of those
9  marks for any reason in the future is appropriate.  15 U.S.C.
10 § 1118; see also Whittaker Corp. v. Execuair Corp., 953 F.2d
11 510, 518-19 (9th Cir. 1992) (acknowledging that a district
12 court has the power to order the destruction of infringing
13 articles); Online Partners.Com, Inc. v. Atlanticnet Media
14 Corp., 2000 WL 101242, *11 (N.D.Cal. 2000)(ordering the
15 delivery and destruction of infringing articles).
16      For the reasons set forth above, I **RECOMMEND** entering
17 judgment in plaintiff's favor in the amount of $29,743.67.
18 This amount includes $10,000 in damages, $16,257.96 in
19 attorneys' fees, and $3,485.71 in costs.  I also **RECOMMEND**
20 that the defendant, his agents, and all persons acting for,
21 with, by, or through him, are enjoined as follows:
22 1.   To refrain from using plaintiff's marks, or any
23      derivation or combination of words thereof, for any
24      reason, including in domain names and on the Internet.
25 2.   Pursuant to 15 U.S.C. § 1118, to destroy any
26      reproduction, counterfeit, copy, or colorable imitation
27      of the infringing domain names, in whatever format, and
28 ///

11

all plates, molds, matrices, and other means of making the same.

Dated: August 5, 2005

_____
Bernard Zimmerman
United States Magistrate Judge

G:\BZALL\-REFS\SIMPSON\DEFAULTJUDGMENT.wpd

12